**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | | |
| | ) | | |
| v. | ) | **No.** | **14-cr-189 (TSC)** |
| | ) | | |
| **MICHAEL LEE SMITH,** | ) | | |
| | ) | | |
| **Defendant.** | ) | | |
| _____ | ) | | |

## REPLY IN SUPPORT OF *PRO SE* MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

Mr. Michael Lee Smith, through counsel, hereby submits this reply in support of his *pro se* Motion Under 18 U.S.C. § 3582(c)(1)(A)(i) for Modification of Sentence ("Def.'s Mot."), ECF No. 69, responding to the Government's Opposition to Defendant's Emergency Motion to Reduce Sentence Pursuant to the Compassionate Release Statute 18 U.S.C. § 3582(c)(1)(A)(i) ("Gov't Opp'n"), ECF No. 70. As an African American male with a heart condition, a history of smoking, and possible neurological problems from gunshot wounds, incarcerated in a setting where inmates and staff cannot prevent the spread of COVID-19, Mr. Smith is highly susceptible to catching COVID-19 and becoming seriously ill or dying from it. The Court should grant Mr. Smith's motion and order his immediate release from imprisonment.

### APPLICABLE LEGAL PRINCIPLES

In First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018), Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow a defendant to file a motion for a reduction of sentence based on extraordinary and compelling reasons. Prior to this amendment, the BOP was the sole entity allowed to file such a request. Now, a defendant may file such a motion either (1) after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

motion on the defendant's behalf," *or* (2) after "the lapse of 30 days from the receipt of such a

request by the warden of the defendant's facility, whichever is earlier[.]"  First Step Act §

603(b).

Section 3582(c)(1)(A) provides, in relevant part, that the Court "may reduce the term of

imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they

are applicable, if it finds that—"

    (i)      extraordinary and compelling reasons warrant such a reduction; or

    (ii)     the defendant is at least 70 years of age, has served at least 30 years in
            prison, pursuant to a sentence imposed under section 3559(c), for the
            offense or offenses for which the defendant is currently imprisoned, and a
            determination has been made by the Director of the Bureau of Prisons that
            the defendant is not a danger to the safety of any other person or the
            community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by
the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's applicable guidance was issued before the passage of the

First Step Act and has not been amended to account for the statutory changes to § 3582.

Accordingly, courts have held that "the most sensible interpretation of the Sentencing

Commission's guidance in light of Congress's recent statutory amendments is that 'the

Commission's existing policy statement provides helpful guidance on the factors that support

compassionate release, although it is not ultimately conclusive.'"  *United States v. Bucci*, 409 F.

Supp. 3d 1, 2 (D. Mass. 2019) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL

3046086, at *5 (D. Me. July 11, 2019)); *see also United States v. Beck*, No. 1:13-cr-186-6, 2019

WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful

guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

Tracking the language of the statute, the Guidelines suggest that a sentence reduction may be warranted if "the court determines that—"

(1)    (A)  extraordinary and compelling reasons warrant the reduction; or

(B)  the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2)    the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3)    the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

The Commission set forth four categories qualifying as extraordinary and compelling: (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, and (4) compelling family circumstances. *See* U.S.S.G. § 1B.13 appl. n. 1(A)–(C). But, recognizing these categories might not encompass the wide range of compelling reasons, the Commission added a catch-all—"other reasons"—which may act "in combination" with the prior categories or might be wholly independent. *See* U.S.S.G. § 1B1.13 appl. n. 1(D).[1] The Guidelines application notes further

---

[1]  To the extent that application note 1(D) restricts "other reasons" to those "as determined by Director of BOP," it conflicts with the First Step Act's statutory amendments and does not apply. *See United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). Instead, "[r]ead in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release." *Beck*, 2019 WL 2716505, at *9. Even before the First Step Act, the Commission recognized "that courts are in a 'unique' position to determine whether such circumstances are present." *Id.* at *9 & n.11; U.S.S.G. § 1B1.13 appl. n. 4.

recognize that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction." *Id.* appl. n. 4. Thus, "[r]ead as a whole, the application notes suggest a flexible approach which considers all relevant circumstances." *Beck*, 2019 WL 2716505, at *8.

The First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate." *Beck*, 2019 WL 2716505, at *6. Indeed, by permitting defendants to file sentence reduction motions directly with the sentencing court, regardless of whether the BOP has weighed in, the First Step Act reflects Congress's aim to diminish the BOP's control over compassionate release. *See United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (explaining that "defendants no longer need the blessing of the BOP to bring such motions").

This Court may determine whether a defendant's conditions are extraordinary and compelling independent of those reasons provided by the Commission or the BOP. Courts have concluded that, after passage of the First Step Act, compassionate release is not limited by the Commission's or the BOP's understanding of "extraordinary and compelling reasons," and that courts can thus determine those reasons. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Bellamy*, 2019 WL 3340699, at *2 n. 5 (D. Minn. July 25, 2019) (citing lower court decisions); *Beck*, 2019 WL 2716505, at *5-6 (noting the First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate"); *Cantu*, 2019 WL 2498923, at *3-5.

**ARGUMENT**

I.    **THE COURT HAS JURISDICTION TO DECIDE THIS MOTION AND SHOULD EXCUSE ANY FAILURE TO COMPLY WITH THE PROCEDURAL REQUIREMENT.**

The government argues that Mr. Smith's "motion is not properly before the Court" because he "has failed to exhaust his administrative remedies."  Gov't Opp'n at 10.  The government claims that "Congress expressly required exhaustion of administrative remedies in the compassionate release context" and that the Court lacks authority to grant compassionate release "[a]bsent exhaustion."  *Id*. at 10 & n. 6.  The government is incorrect:  the statute does not require exhaustion of administrative remedies and this Court has authority to grant compassionate release even though Mr. Smith has not "exhausted" the BOP's administrative remedy process.

As an initial matter, section 3582 contains no true exhaustion scheme at all; it is a 30-day right-of-first refusal rule.  *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (section 3582 "requires the defendant to *either* exhaust administrative remedies or simply to wait 30 days") (emphasis in original).  The government and the cases cited by the government (Gov't Opp'n at 9-10) fail to recognize that the statute does not have an "exhaustion requirement."  The statute simply gives the BOP the opportunity to request compassionate release with the Court on behalf of an inmate up to 30 days before the inmate requests compassionate release from the Court directly.

The "exhaust or wait 30 days" rule found in § 3582(c)(1)(A) does not limit a federal court's jurisdiction to grant a reduction in sentence; it is a "claims processing" rule that "merely controls who—the BOP or defendant—may move for compassionate release and when such a motion may be made.  It simply delineates the process for a party to obtain judicial review, not

referring to the adjudicatory capacity of courts." *Haney*, 2020 WL 1821988, at *2. Thus, it can be excused. *Id*. at *3; *see also United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294, at *4 (S.D.N.Y. Apr. 14, 2020) (same).

Counsel submitted a compassionate release request with the Warden of FCI Beckley for Mr. Smith on May 5, 2020. *See* Exhibit A, Compassionate Release Request. However, this Court need not wait 30 days to decide this motion. The Court may and should excuse compliance with the procedural requirement given the unprecedented and serious national emergency. *See Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (quoting *Granberry v. Greer*, 481 U.S. 129, 134 (1987)) (recognizing that "exceptional circumstances of peculiar urgency" can excuse exhaustion).

As this Court and many others have ruled, "the exhaustion requirement is non-jurisdictional and [] it may be waived" in certain circumstances, such as current circumstances

posed by the COVID-19 pandemic.  *See United States v. Jennings*, No. 18-cr-017-TSC, ECF

No. 30 at 2-4 (D.D.C. Apr. 22, 2020).[2]

There is no persuasive reason to upset the Court's ruling on this issue.  All judges in this

district to have confronted this issue have found that the exhaustion requirement may be excused.

*See, e.g.*, *United States v. Powell*, No. 94-cr-316-ESH, ECF No. 98 (D.D.C. Mar. 28, 2020)

(holding that "requiring defendant to first seek relief through the [BOP's] administrative process

would be futile"); *United States v. Ghorbani*, No. 18-cr-225-PLF, ECF No. 131 (D.D.C. Apr. 3,

2020); *United States v. Malone*, 13-cr-231-ESH, ECF No. 229 (Apr. 27, 2020) ("Exhaustion

under § 3582(c)(1)(A) does not require a defendant to wait for a final decision from the BOP").

---

[2] *United States v. Bess*, 2020 WL 1940809, at *7 (W.D.N.Y. Apr. 22, 2020) (holding "section 3582(c)(1)(A)'s requirement is subject to equitable exceptions, including judicial excusal"); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *2 (S.D.N.Y. Apr. 13, 2020); *Haney*, 2020 WL 1821988, at *4  ("in the extraordinary circumstances now faced by prisoners as a result of the COVID-19 virus and its capacity to spread in swift and deadly fashion, the objective of meaningful and prompt judicial resolution is clearly best served by permitting Haney to seek relief before the 30-day period has elapsed."); *United States v. Sawicz*, No. 08 Cr. 287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement because "[e]ven a few weeks' delay carries the risk of catastrophic health consequences" for prisoner in high risk group); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion requirement, given defendant's advanced age, health conditions putting him in a high risk group for complications and death resulting from COVID-19, and fact that he was in a detention facility where prisoners live in crowded conditions); *United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (waiving § 3582(c)(1)(A)'s exhaustion requirement where delay carried the risk of the vulnerable defendant contracting COVID-19); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of [d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the [c]ourt waives the exhaustion requirement of Section 3582(c)(1)(A)."); *see also Matter of Extradition of Toledo Manrique*, No. 19-MJ-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (refusing to delay consideration of release to await evidence of an outbreak in the jail because that "may be too late").

The government previously agreed, explicitly and implicitly, that the exhaustion requirement can be waived.  *See Ghorbani*, No. 18-cr-225-PLF, ECF No. 129, at 2 n.1 (joint submission by the government and defense arguing that "a Court can dispense with the administrative exhaustion requirement where, as here, there are 'exceptional circumstances of particular urgency.'" (quoting *Hendricks*, 993 F.2d at 672)); *Powell*, No. 94-cr-316-ESH, ECF No. 95 (not opposing a similar request).  The government has agreed the exhaustion requirement can be waived in other districts as well.  *See, e.g.*, *United States v. Gentile*, No. 19-cr-590, 2020 WL 1814158, at *2 (S.D.N.Y. Apr. 9, 2020) (noting the government "stated it would waive any argument that Gentille had failed to satisfy the exhaustion requirement"); *United States v. Haynes*, No. 6:18-cr-6015, ECF No. 270 (W.D.N.Y. Apr. 14, 2020) (government notifying the court that it did not oppose the defendant's release request where "the defendant has not technically exhausted all administrative remedies as required by statute").

Now, in a footnote, the government claims it "wrongly conceded the exhaustion issue in *Powell*" and that "the BOP [did] not contest exhaustion" in *Ghorbani*.  Gov't Oppn' at 11 n. 7. The government does not explain the basis for its changed position, nor why the BOP's position on exhaustion matters at all in compassionate release proceedings.  "[S]erious questions are raised when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens." *Bradhwa v. Stumpf*, 545 U.S. 175, 189 (2005) (Souter J. and Ginsberg J. concurring); *United States v. Redrick*, 841 F.3d 478, 482 (D.C. Cir. 2016) (noting that the Court "would find such a divergence in Justice Department policy quite troubling if it were truly pressed").

Although the government asserts that courts have "overwhelmingly" ruled there are no exceptions to the procedural requirement in § 3582, Gov't Opp'n at 9-10, virtually every day,

courts release contrary decisions. *See, e.g.*, *United States v. Saad*, No. 16-cr-20197, 2020 WL 2065476, at *11 (E.D. Mich. Apr. 29, 2020). And tellingly, even judges who first ruled exhaustion could never be excused have changed their minds. *See, e.g.*, *United States v. Bess*, 2020 WL 1940809, at *6 n.9 (W.D.N.Y. Apr. 22, 2020) (noting that "Judge Nathan first found that . . . [the] exhaustion requirement is written in mandatory terms," and was unexusable, but "she subsequently was persuaded by Judge Liman's decision in *Russo* and reached the contrary conclusion").

The government's suggestion that courts cannot invoke equitable powers to waive or excuse the procedural requirement in the compassionate release statute contains, if correct, would lead to absurd and catastrophic results. Moreover,

> "Congress cannot have intended the 30-day waiting period . . . to rigidly apply in the highly unusual situation in which the nation finds itself today." *Haney*, 2020 WL 1821988, at *3. The statute was "designed to 'enhance public safety' and 'make[ ] . . . changes to Bureau of Prisons' policies and procedures to ensure prisoner and guard safety and security.'" *Scparta*, 2020 WL 1910481, at *7 (alteration in original) (quoting H.R. Rep. No. 115-699, at 22 (2018)). Neither purpose is served by keeping a vulnerable individual incarcerated in precarious conditions that pose risks to not only his own health and safety, but also to the health and safety of the prison staff and the communities to which they return each day.

*Bess*, 2020 WL 1940809, at *7.

Courts have recognized three grounds for judicial waiver of the "exhaustion" requirement: (1) "where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue," or where "[u]ndue delay" would "in fact result[] in catastrophic health consequences[;]" (2) "where the administrative process would be incapable of granting adequate relief, including situations where the relief the agency might provide could, because of undue delay, become inadequate[;]" and (3) "where pursuing agency review would subject [the claimant] to undue prejudice." *United States v. McCarthy*, No. 3:17-

CR-0230 (JCH), 2020 WL 1698732, at *3 (D. Conn. Apr. 8, 2020) (quotation marks omitted) (citing *Washington v. Barr*, 925 F.3d 109, 118-20 (2d Cir. 2019)); *accord United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020); *United States v. Colvin*, No. 3:19-cr-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020); *see also Orr v. Assurant Employee Benefits*, 786 F.3d 596, 602 (7th Cir. 2015).

All three exceptions to exhaustion apply here. COVID-19 is exponentially spreading in prisons across the country. The virus is lethal, and individuals like Mr. Smith, an African American man with a heart condition, a history of smoking, and neurological issues related to gunshot wounds, are particularly at risk, as discussed in more detail below. A 30-day delay may result in catastrophic consequences, make the waiting period futile, and result in undue prejudice. Every minute brings greater risks to Mr. Smith and thus constitutes irreparable harm. What was a 100-month sentence could become a death sentence—one that is much more likely avoided if (like the rest of the country) Mr. Smith could exercise social distancing, proper hygiene, and get access to medical care before it's too late. *See United States v. Foster*, No. 1:14-cr-324-02, Dkt. No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"). The news stories emerging about federal prisons are disheartening, to say the least, and reinforce the point that by the time BOP acts or more likely, fails to act, it may be too late.

The BOP will not release Mr. Smith on home confinement under the CARES Act, *see* Gov't Opp'n at 4, so it has effectively already refused to provide any relief. Requesting compassionate release with the BOP is futile for Mr. Smith. The agency's compassionate release policies are ambiguous, arbitrary-enforced, and generally bar relief to inmates until they are

desperately unwell.  The amendment to the compassionate release statute was Congress's

response to the BOP's failure to "properly manage the compassionate release program, resulting

in inmates who may be eligible candidates for release not being considered" or being

unjustifiably rejected.  U.S. Dep't Justice, *Fed. Bureau of Prisons' Compassionate Release

Program*, p. 11 (2013);[3] *see generally* Stephen R. Sady & Lynn Deffebach, *Second Look

Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That

Result in Overincarceration*, 21 Fed. Sent'g Rep. 167 (2009); Shon Hopwood, *Second Looks &

Second Chances*, 41 Cardozo L. Rev. 83 (Oct. 2019).  Mr. Smith is not eligible for

compassionate release under BOP's program statement policies, notwithstanding the

extraordinary and compelling circumstances that exist for him in light of the COVID-19

pandemic.  *See* Bureau of Prisons, Program Statement 5050.50, Compassionate Release

Procedures (Jan. 17, 2019).

The BOP rarely grants an internal request and files a motion with the court.  Yet, while

the virus is spreading and people are dying, the government has repeatedly sought to delay

access to the courthouse by arguing inmates should pointlessly apply and reapply to BOP for

relief that will indisputably be denied.  The government cannot point to a single motion for

compassionate release that the BOP has filed this year.  Last year, in 2019, BOP received 1,735

inmate applications and filed a motion for only 55 of them; it declined to let a judge decide 97%

---

[3] More specifically, the Inspector General found the BOP: (1) failed to provide adequate
guidance to staff regarding the medical and nonmedical criteria for compassionate release
consideration; (2) had no timeliness standards for reviewing compassionate release requests, and
timeliness standards for inmate appeals do not consider the special circumstances of medical
compassionate release requests; (3) did not have formal procedures to inform inmates about the
compassionate release program; and (4) failed to have a system to track compassionate release
requests, the timeliness of the review process, or whether decisions made by institution and
Regional Office staff are consistent with each other or with BOP policy.  *Id.*

of applications.  *See* Ex. B, BOP Comp. Release – First Step Act of 2018, Rep. to Congress, 1.

In 41 cases, inmates died while their requests sat "pending" in the BOP.  *Id*. at 4.

Moreover, the agency refuses to consider the threat of coronavirus whatsoever.  Indeed,

the BOP director wrote to the Federal Defenders last week: "institutions continue to evaluate

and process compassionate release requests *based on existing criteria*" in Program Statement

5050.50—which does not include threats by coronavirus.  *See* Ex. C, Letter from BOP (Apr. 20,

2020). Wardens have disclosed that "the current pandemic of the COVID-19 virus in the

community is *not* a qualifying factor" that BOP will consider.  *United States v. Petrossi*, No. 17-

cr-192-CCC (M.D. Penn. Apr. 9, 2020) (ECF No. 124-4).  Accordingly, making any

coronavirus-related request to the BOP is demonstrably pointless.

A motion in this Court is Mr. Smith's only possible remedy.  He needs to be released

now—not at some undetermined future point, after he has been stricken by COVID-19.  The

BOP, under far better conditions, typically took months to address the requests of inmates.  *See*

Ex. C, BOP Rep. at 4 (showing that non-terminal-illness compassionate release requests took on

average between 58 and 117 days to be addressed by the BOP). With the current pandemic, the

system is undoubtedly overwhelmed with new requests—a reality that will further bog down and

delay the process.  The BOP cannot and will not grant the timely relief to Mr. Smith.

In sum, the 30-day waiting period is not a jurisdictional bar to considering a

compassionate release claim.  Rather, it is a claim-processing rule and like any claim-processing

rule, there are certain recognized exceptions that must apply in some cases.  Mr. Smith has to

show only that one of them applies to excuse the exhaustion requirement.  And here, all three

(futility, inability to grant relief, and undue prejudice) independently and collectively justify

waiving the 30-day requirement.  Under the current exigent and unique circumstances, the

BOP's administrative process is incapable of protecting Mr. Smith from the risk of COVID-19

infection that he faces right now.  As courts have noted, "[u]nder such circumstances, 30 days is

anything but 'exceptionally quick'—indeed, each day, perhaps each hour, that elapses 'threatens

incarcerated defendants with greater peril.'"  *United States v. Gross*, 2020 WL 1673244, at *3

(S.D.N.Y. Apr. 6, 2020) (internal citations omitted); *United States v. Gorai*, 2020 WL 1975372,

at *2 (D. Nev. Apr. 24, 2020) (same).  For these reasons, this Court should not wait 30 days

before deciding his motion.

Should the Court find the timing of this motion renders any ruling premature, Mr. Smith

requests that it either (a) direct the government to respond within a timeframe to allow for the

Court's full consideration on June 5 or, if that is deemed inappropriate, (b) hold the motion in

abeyance.  The Court should account not only for the time-sensitive nature of the extraordinary

and compelling reasons that support relief but also for the improbability that the warden will

address Mr. Smith's May 5 request within 30 days.

## II. THE COVID-19 GLOBAL PANDEMIC IS AN EXTRAORDINARY AND COMPELLING REASON TO GRANT MR. SMITH COMPASSIONATE RELEASE.

### A. The Emergency of COVID-19 in Federal Prisons, By Itself, Is An Extraordinary and Compelling Circumstance.

On March 11, 2020, the World Health Organization ("WHO") officially classified the

spread of COVID-19, the disease caused by the novel coronavirus, as a pandemic.[4]  On March

13, 2020, the President of the United States declared the COVID-19 outbreak a national

---

[4] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 et seq.[5]  Several days later, the White House issued guidance recommending that gatherings of *ten or more* persons be canceled or postponed.[6]  An overwhelming majority of states implemented stay-at-home orders and people must practice social distancing and wear masks when they cannot stay home.[7]

In the weeks since these pronouncements, COVID-19 has continued to spread at an alarming rate.  As of May 5, 2020, over 3.5 million people have been infected globally and over 243,000 have died.[8]  In the United States, more than 1.17 million people have been infected and more than 68,000 people have died.[9]  (The numbers, which increase sharply every day, almost certainly underrepresent the true scope of the crisis in the U.S. considering the widespread unavailability of test kits to detect the virus.)  To stem the spread of the disease, the Centers for Disease Control (CDC) broadly advised people to take basic preventive actions, such as avoiding crowds, staying six feet away from others, keeping surfaces disinfected, and frequently washing their hands or using hand sanitizer.[10]

---

[5] The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (March 13, 2020).

[6] Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, NYTimes.com (March 17, 2020).

[7] Sarah Mervosh et. al, *See Which States and Cities Have Told Residents to Stay at Home,* NYTimes.com (last updated April 20, 2020).

[8]  World Health Organization, *Coronavirus disease 2019 (COVID-19) Situation Report – 106* at 1 (May 5, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200505covid-19-sitrep-106.pdf?sfvrsn=47090f63_2.

[9] Centers for Disease Control (CDC), *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[10] CDC, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

Public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[11] Indeed, the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[12]  As courts have recognized, there can be no doubt that "the COVID-19 virus spreads with uncommon and frightening speed in carceral settings."  *United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020).

> Jails and prison are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment. "Realistically, the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, No. 18-CR-713, 2020 U.S. Dist. LEXIS 56188, at *1 (S.D.N.Y. Mar. 31, 2020).

*Id.*

As experts predicted, COVID-19 cases and deaths in federal prison are increasing.  On May 5, the BOP reported 2,066 federal inmates and 359 staff tested positive for COVID-19 nationwide, not including the 561 inmates and 149 staff who supposedly "recovered."[13]

---

[11] *Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[12] Joseph A. Bick, *Infection Control in Jails and Prisons,* Clinical Infectious Diseases 45(8): 1047-1055 (2007), https://doi.org/10.1086/521910; Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

[13] *See* https://www.bop.gov/coronavirus/.  It is unclear whether these "recovered" individuals are or were nonetheless contagious when they were permitted to return to the general population and resume staff duties.

Notably, "seemingly recovered patients" can "retest[] positive" and "at least a proportion of recovered patients still may be virus carriers."[14]  The BOP first began issuing medical and screening guidance in January and February and instituted a nationwide lockdown on March 24, yet, its self-reported numbers continue to rise at a rate of growth higher than that of the entire U.S.[15]

These numbers, as bad as they are, are "almost certainly an undercount."  *See* Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, NY Times (Mar. 30, 2020); *see also* Walter Palvo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes.com (Apr. 1, 2020); *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718, at *23 (E.D. Pa. Apr. 1, 2020) (explaining why "[t]he BOP's [rapidly growing number of] reported cases . . . almost certainly underestimate the true number of infections"); *United States v. West*, No. 1:17-cr-390-AT-1, Corrected Order (Redacted) at 4, ECF No. 53 (N.D. Ga. Mar. 30, 2020) (recognizing the BOP's "incomplete reporting of COVID-19 cases"). In prison, just as in the rest of the United States, there are not enough tests.[16]

---

[14] Stephanie Pappas, *Can people spread coronavirus after they recover?* Live Science (Feb. 29, 2020), https://www.livescience.com/coronavirus-spread-after-recovery.html (quoting researchers based in China whose study about reinfection was published in the journal JAMA).

[15]  The Federal Defenders of New York, Southern and Eastern, update these statistics daily: https://federaldefendersny.org/.

[16] *See* Katie Thomas, *The Latest Obstacle to Getting Tested? A Shortage of Swabs and Face Masks,* NYTimes.com (Mar. 18, 2020); Lauren Webber et al., *Testing Swabs Run In Short Supply As Makers Try To Speed Up Production*, www.npr.og (Mar. 18, 2020); Matthew Perone, *US virus testing faces new headwind: Lab supply shortages*, ABC News (Mar. 21, 2020); Robert P. Baird, *Why Widespread Coronavirus Testing Isn't Coming Anytime Soon*, NewYorker.com (Mar. 24, 2020); Steven Mufson et al., *The scramble for the rapid coronavirus tests everybody wants*, WashingtonPost.com (Apr. 1, 2020).

Also, BOP admitted underreporting in a congressional briefing held April 7, 2020. There, the BOP reported that it lists only positive lab tests, and does not publicly report "open" cases, which the BOP defines as "suspected, presumed positive, or clinically confirmed." The BOP reported to Congress that, as of April 7, 2020, there were hundreds of prisoners in isolation (which meant symptomatic, but not necessarily tested) and thousands of prisoners in quarantine in BOP facilities across the country, which *were not reported on the BOP website.*[17] It is also possible that some inmates do not report their symptoms "fearing they may be abandoning in an isolation cell and left for dead." Kimberly Kindy, *Inside the Deadliest Federal Prison, the Seeping Coronavirus Creates Fear and Danger*, Washingtonpost.com (Apr. 9, 2020).

"The Associated Press reported this week that 70 percent of federal prisoners who have been tested have tested positive. At the same time, the Marshall Project recently reported that less than one half of one percent of federal prisoners have been tested."[18] Just last week, after a court criticized BOP for failing to test inmates and thereby underreporting the infection rate, the agency began mass testing at only a few prisons. *See Wilson v. Williams*, 2020 WL 1940882, at *11 (N.D. Ohio Apr. 22, 2020) ("it is unlikely that these figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available"). The increased reporting unsurprisingly resulted in a massive increase in confirmed cases:

| INSTITUTION | POSITIVE CASES PRE-WIDESPREAD TESTING (as of April 24, 2020)[19] | POSITIVE CASES POST-WIDESPREAD TESTING |
|---|---|---|
| | | |

---

[17] The BOP website then reported only 253 inmates were infected.

[18] Radley Balko, *Stopping covid-19 behind bars was an achievable moral imperative. We failed.*, WashingtonPost.com (May 1, 2020).

[19] *See* Ex. D, April 24, 2020 BOP COVID-19 Cases.

|  |  | (as of April 29, 2020)[20] |
|---|---|---|
| Fort Worth FMC | 132 | 453 |
| Terminal Island FCI | 70 | 242 |
| Butner Medium I | 47 | 221 |

These numbers then became, by May 3: 632 at Terminal Island; 446 at Fort Worth; and 225 at Butner Medium I.[21]  Testing matters. Out of 2,700 tests conducted nationwide by the BOP, nearly 2,000 came back positive—roughly 70%.[22]  If this figure is generalizable to the broader population in the BOP's care, all inmates are in grave danger.

Inconsistencies and anomalies in the BOP's accounting abound.  The BOP has undermined its credibility by failing to provide accurate and transparent accounting of the number of infections in the BOP system.  It provides only a snapshot of a moment in time with its numbers, removing patients it deems as "recovered" from the positive cases at each institution, making it impossible to know the cumulative number of positive cases at any given facility since the outbreak began.  The BOP also recently confirmed what many advocates had long suspected: "that the bureau's case tracking does not include the privately run prisons," which have "a combined capacity for nearly 17,600 inmates."  The Bureau "did not say why," and there is no reasonable explanation.[23]

---

[20]  *See id*., April 29, 2020 BOP COVID-19 Cases.
[21] *See id*., May 3, 2020 BOP COVID-19 Cases.

[22] Michael Balsamo*, Over 70% of tested inmates in federal prisons have COVID-19*, Associated Press (Apr. 29, 2020), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f.

[23] Dan Kane, *A second federal prison in NC has coronavirus cases, and U.S. officials aren't tracking it*, News & Observer (Apr. 19, 2020), https://www.newsobserver.com/news/local/article242125516.html.  The BOP website now appears to report numbers at some, but not all, privately run prisons.

Some BOP institutions have opted to keep some inmate and staff deaths "off the books" completely.  At USP Lompoc, an inmate who appeared to have contracted COVID-19 was put on a bus home (even though he was too sick to walk), only to die thereafter, and is thus not counted as a USP Lompoc death.[24]  Similarly, on April 17, 2020, a 39-year-old staff member at USP Atlanta died suddenly in her home of COVID-19.[25]  The BOP confirmed the staff member's death to a news outlet, but does not report the death on its website.[26]  The press reports that, according to a news release provided by the prison (but not anywhere accessible to others), the deceased staff member "had been successfully screened prior to entry [into the prison] and was asymptomatic" the Friday before she was found dead in her home.[27]  And "four correctional officers at USP Atlanta [] complained of insufficient access to protective equipment and inconsistent communication about how many staff and inmates were infected at any given time."[28]

---

[24]  Cal Coast Times, *Lompoc prison inmate dies amid worsening coronavirus outbreak* (Apr. 17, 2020), https://calcoasttimes.com/2020/04/17/lompoc-prison-inmate-dies-amid-worsening-coronavirus-outbreak/; Richard Winton, *Coronavirus outbreak at Lompoc prison is the worst in the nation: 69 inmates, 25 staff infected*, LATimes.com (Apr.16, 2020).

[25]  Cassidy McDonald, *She was promoted a month before her death. Coworkers say she was never moved into her new role, away from sick inmates*, CBS News (Apr. 20, 2020), https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/.

[26] *See* BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/ (reporting 0 staff deaths as of May 5, 2020).

[27] WSBTV.com News Staff, *Atlanta Federal Penitentiary employee found dead tested positive for coronavirus*, WSBTV (Apr. 17, 2020), https://www.wsbtv.com/news/local/atlanta/atlanta-federal-penitentiary-employee-found-dead-tested-positive-coronavirus/UMVOBY6WZVCKHEOGLBHAIESLHU/.

[28] McDonald, *supra*, note 25.

That the BOP wishes to keep the numbers low at the expense of accuracy, transparency, and staff and inmates' health is supported by the fact that, in at least one facility, BOP has declared all inmates presumptively infected, stopped testing altogether, and will not release infection estimates.[29]   In another, the president of the correctional officers union estimates inmate infection at 600% of BOP's public number.[30]   One BOP employee told reporters that "the Bureau is playing with these numbers . . . , if they don't test 'em and they don't get confirmed they don't have to be reported."[31]   At one facility where at least six inmates died of COVID-19, and which houses a total of 2,421 inmates, the government recently revealed that the facility had only 55 coronavirus tests, had only tested 37 inmates, and had only recently received 25 additional "rapid tests," though it expected 25 more each week.   At this facility, when the BOP listed that there were 59 confirmed cases, "[o]fficials suspect[ed] another 207 ha[d] it."[32]

---

[29] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission*,' The Lens (Mar. 31, 2020), https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/ ("But the spokesperson said that the BOP would not be releasing the number of presumed positive cases, making it impossible to know how many prisoners at the facility have actually contracted the virus.").

[30] Staff report, *Elkton union president reports different COVID-19 stats than Federal Bureau of Prisons*, WKBN News, Lisbon Ohio (Apr. 9, 2020), https://www.wkbn.com/news/coronavirus/elkton-union-president-reports-different-covid-19-stats-than-federal-bureau-of-prisons/ (stating that BOP was reporting just 10 inmate infections, but the union president had said management inside the prison gave "different numbers": 67 positive or symptomatic and isolated, 44 hospitalized, 14 on ventilators, 12 staff infected, three dead).

[31] Chrastil, *supra*, note 29.

[32] Eric Heisig, *Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio facility in wake of Trump's claim that 'anybody' can get tested*, Cleveland.com (last updated Apr. 18, 2020). https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html.

Just because the BOP website does not, today, report any confirmed cases at FCI Beckley does not mean there are no cases there.  The government has not provided any proof, by way of a declaration from the BOP, that FCI Beckley is testing and that there are genuinely zero cases there.  Because it is unclear whether anyone at all has been tested at FCI Beckley, the BOP's reports of zero cases at his facility are problematic.  *See United States v. Asaro*, 2020 WL 1899221, at *3 (E.D.N.Y. Apr. 17, 2020) (noting that, where there are no reported cases in a facility, "absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility," and emphasizing that "[t]he virus is spreading" in the state where the federal prison is located).

Moreover, because of how quickly COVID-19 spreads in a prison environment, facilities with zero cases can become deadly hotspots within a matter of days.  For example, on April 3, the government opposed a release motion for an inmate in FCI–Butner, citing the BOP's generic COVID-19 policies, such as screening, visitation lockdown, and social distancing.  *See United States v. Rumley*, No. 08-cr-5, Dkt. 185, at 4–7 (W.D. Va. Apr. 3, 2020).  On March 24, Butner reported its first case.  By April 14, four inmates had died and 45 were confirmed infected.[33]  By May 4, six inmates had died and 210 were confirmed infected.  And, despite the BOP's "precautions," the virus has infected Butner's medical center, which houses extremely medically vulnerable inmates.[34]

FCI-Terminal Island is another example of this troubling phenomenon of rosy prognostications followed by a facility plunging into illness and death.  As of April 13, that

---

[33] COVID-19 Coronavirus page, Federal Bureau of Prisons (archived copy, Apr. 14, 2020), https://web.archive.org/web/20200415200817/https://www.bop.gov/coronavirus/index.jsp.

[34] *Id.* (May 4, 2020), https://www.bop.gov/coronavirus/index.jsp

prison reported seven positive inmate cases and two positive staff cases.  As of May 4, 2020,

those numbers have exploded—623 prisoners have tested positive, and five have died. Fourteen

staff members have tested positive as well. Similar outbreaks have occurred at federal prisons in

Elkton, Oakdale, and Fort Worth.[35]  Even the Metropolitan Correctional Center in Chicago has

not been immune—despite optimism in late March that a defendant at the MCC was safe

because "Defendant has failed to cite to any evidence that Covid-19 is in the area within the

facility within which he is currently housed."[36]  As of May 4, 2020, 98 detainees at the MCC

tested positive, along with 21 staff members.[37]

     COVID-19 is already in FCI Beckley's community—meaning it is only a matter of time

before a guard or other staff carries it into the facility, in the event that has not already happened.

As of May 7, West Virginia reported 1,287 positive cases and 51 deaths.  *See*

https://dhhr.wv.gov/COVID-19/Pages/default.aspx.  Raleigh County, where FCI Beckley is

---

[35] *See, e.g.*, Debbie Holmes, *After Six COVID-19 Deaths, Judge Orders Elkton Prison to Transfer At-Risk Inmates*, WOSU Radio (Apr. 22, 2020), https://radio.wosu.org/post/after-six-covid-19-deaths-judge-orders-elkton-prison-transfer-risk-inmates#stream/0 (discussing Elkton); Sadie Gurman, et al., *Coronavirus Puts a Prison Under Siege*, Wall Street Journal, (Apr. 6, 2020), https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences-11586191030 (discussing Oakdale); Scott Gordon, *COVID-19 Cases Nearly Quadruple Inside Fort Worth Federal Medical Prison*, NBC DFW (Apr. 23, 2020), https://www.nbcdfw.com/news/coronavirus/covid-19-cases-quadruple-to-132-at-fort-worth-federal-prison/2356912/ (discussing Fort Worth); Mitchell McCluskey et al., *A North Carolina prison complex has 60 inmates and 23 staff members with coronavirus*, CNN (Apr. 12, 2020), cnn.com/2020/04/12/us/butner-prison-coronavirus-cases/index.html. Just last Friday, an outbreak of COVID-19 cases at the Federal Medical Center in Lexington, Kentucky "led to a sharp increase" in the area's COVID-19 cases, "when the city had settled into a period of relatively few new cases." Daniel Desrochers, *Outbreak of COVID-19 reported at Federal Medical Center in Lexington: 33 inmates positive*, Lexington Herald-Leader (May 1, 2020), https://www.kentucky.com/news/coronavirus/article242449731.html.

[36] *United States v. Price*, 18-CR-597, Dkt. 70 (Mar. 23, 2020) (Kendall, J.) (denying defendant's motion for pretrial release).

[37] BOP COVID-19 Coronavirus (May 4, 2020), https://www.bop.gov/coronavirus/index.jsp.

located reported 9 cases.  *Id.*  COVID-19 enters a facility from the community the same way it spreads outward—carried in by well-meaning guards and staff who may have picked it up in the surrounding area.  It is only a matter of time before the BOP will be forced to test and report the cases at that FCI Beckley.  All of the BOP facilities where people are sick, dead, or dying started out with zero reported cases—and the situation turned deadly quickly.

As of this filing, there have been at least 41 federal inmate deaths attributed to COVID-19 disease.  These deaths will surely not be the last.

Recognizing the unique risks that correctional facilities pose to both inmates and employees, members of Congress asked the BOP on March 18, 2020, to allow for the immediate release of "federal inmates who are vulnerable to COVID-19 (for instance, persons who are pregnant, who are 50 years old and older, and who suffer from chronic illnesses like asthma, cancer, heart disease, lung disease, diabetes, HIV, or other diseases that make them vulnerable to COVID-19 infection)."  The following week, Attorney General Barr urged the Director of the BOP to prioritize home confinement for such vulnerable individuals.  On March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly or medically vulnerable inmates, including those with asthma.  The same day, dozens of leading public health experts made a similar request, asking the President to commute the sentences of all medically vulnerable people.  Senators Dick Durbin (D-IL) and Chuck Grassley (R-IA) have publicly questioned whether the BOP's numbers are accurate and whether the BOP is

downplaying the threat of COVID-19 behind bars.[38]  That so many stakeholders have come together to ask for the release of medically vulnerable inmates underscores the extraordinary nature of this pandemic.

**B.      The Inability of the BOP to Contain COVID-19 is a Compelling Reason to Grant Compassionate Release.**

The government provides empty assurances that the BOP is prepared to protect Mr. Smith without proof that it can do so, citing nicely-written policies, including BOP's "six-phase framework" (the current status is "Phase Five of the Action Plan"), and suggesting Mr. Smith is at no actual risk.  The policies are window dressing, the infections are skyrocketing, and the BOP is losing a battle against COVID-19 it was never prepared to fight in the first place.

The best evidence that BOP cannot control the spread of coronavirus is that BOP has not controlled the spread of coronavirus, even considering its self-reported undercount of the actual numbers.  In view of both the numbers and what is missing, the government's reliance on the BOP's supposed "extraordinary measures to curtail the risk of COVID-19 in its facilities" rings hollow.  Gov't Opp'n at 13.  Since the start of the pandemic, reports have poured in citing BOP's incompetence at every level, including non-existent education to the inmates and correctional officers about the spread of the virus, dubious staffing decisions undermining the safe-keeping of quarantined inmates, and inadequate testing to confirm credible numbers of cases.   The BOP cannot contain the virus, just as the rest of the world has been unable to.  The difference, importantly, is that those outside the walls of a prison have the option to protect themselves by

---

[38] Letter from Senators Durbin & Grassley to Inspector General Michael Horowitz (Apr. 21, 2020), https://www.durbin.senate.gov/imo/media/doc/DOJ%20IG%20COVID-19%20BOP%20letter%20final%20signed.pdf.

sheltering at home and avoiding close contact with others—steps that can mean the difference between life and death.

That the "BOP has been planning for potential COVID-19 transmissions since January," Gov't Opp'n at 11, makes its failures at FCI Oakdale, which saw its first case in March, a particularly devastating tale.  After Oakdale's first positive inmate, Patrick Jones, died of COVID-19, a union representative at FCI Oakdale recounted that "[t]he bureau [only] last week banned family and friends from visiting inmates, but the officers' union had lobbied the federal prison system to take this action *for weeks* to keep the disease from infiltrating the prison walls." The union representative explained that "staff also asked prison officials — weeks before the first coronavirus case — to shut down a prison labor program within the facility," but that the program "was not shut down until after the first inmate tested positive." [39]  When one staff member questioned the warden about the possibility of COVID-19 coming to that facility, the warden responded, "'Oh, no, because we live in the South, and it's warm here. We won't have any problems.' . . .  Nobody gave us new direction on what we should be doing, how we should be preparing, what to look for, anything."  Then, when Mr. Jones first exhibited COVID-19 symptoms, he was given a mask on his way to the hospital, but the two staff members who took him were deliberately told he only had asthma, and given no protection: "No one told us he might have Covid-19."  And the two staff members were then cleared to return to duty 2 days later.  One correctional officer explained that:

> Most of the [correctional offciers] that tested positive were either working in the
> housing units or sitting on Covid-19 patients in the hospital. In the housing units,

---

[39] Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana*, Wash. Post (Mar. 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html (emphasis added).

they were only wearing surgical masks. They say if you work in an isolation unit, you must wear an N95, but where do you think these inmates are coming from? They're coming from a housing unit where they won't give [the officers] that mask. That's our biggest [complaint]. How is it that you don't wear the N95 mask where the symptoms originate from? If an inmate gets sick in this area and lives in that area, you don't wear a mask, but if you put him in an isolation area, you wear a mask. [40]

After this bungled response, "people [keep] getting sick back to back to back to back."[41]

Oakdale has now had an additional 6 deaths.

Echoing these accounts of FCI Oakdale, "more than a dozen workers in the Bureau of Prisons" reported that "federal prisons are ill-prepared for a coronavirus outbreak. Many lack basic supplies like masks, hand sanitizer, and soap."[42] Staff at one low-security facility described a potential outbreak as "mass chaos," and confirmed that BOP is "just not prepared to handle something of that nature."[43] In fact, an OSHA complaint filed by correctional officers at a federal women's prison in Tallahassee reports a "lack of masks and other personal protective equipment during the coronavirus pandemic." After "[w]eeks of requests from the [correctional officers'] union[] for a supply of protective equipment like masks and gloves," anger "boiled over when officers were supplied with what they call counterfeit N95 masks." The president of the union reported that "[n]one of the labels, logos, the lot number, the inspection number ... none of that stuff was on there"; "[i]t makes no sense," he added, "We spent thousands of dollars

---

[40] Janet Reitman, 'Something Is Going to Explode': When Coronavirus Strikes a Prison, N.Y. Times (Apr. 18, 2020),  https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html.

[41] Kindy, supra, note 39.

[42] N.Y. Times, Coronavirus in the U.S.: Latest Map and Case Count (last updated April 17, 2020, 8:24 A.M. E.T.) https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[43] See Hamilton, supra, note 12.

ordering masks and nobody checked the legitimacy of them to make sure they were real or came from a credible vendor." [44]

The "current modified operations plan" touted by the government, *see* Gov't Opp'n at 11-13, is simply insufficient. The plan does not adequately address pre- and asymptomatic spread of the virus among staffers, contractors, and inmates. Only BOP staff at medical referral centers or in areas of the country with "sustained community transmission" are subjected to "[e]nhanced screening." [45] These so-called "enhanced screenings" of staff require only temperature checks and self-reporting of symptoms—not testing (and could not since tests are in short supply), or for staff to disclose whether they have been in high risk areas or venues or exposed to other symptomatic people. The screening tool used for prison contractors is similarly defective. [46] Since most COVID-19 transmission occurs pre-symptomatically, some people show no symptoms at all, and some acutely ill people have no temperature, these "enhanced screenings" are simply inadequate. [47]

---

[44] James Call, *Correctional officers file complaint about coronavirus at federal prison in Tallahassee*, Tallahassee Democrat (Apr. 17, 2020), https://www.tallahassee.com/story/news/politics/2020/04/18/correctional-officers-file-complaint-coronavirus-tallahassee-federal-prison/5152879002/.

[45] BOP, *Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited on 4/17/2020).

[46] BOP, *Visitor/Volunteer/Contractor Covid-19 Screening Tool*, https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf. For example, the contractor screening tool asks contractors whether they have traveled to China, Iran, South Korea, Italy, and Japan in the last 14 days, but does not screen those who have traveled to, for instance, Spain (184,948 cases), France (147,113 cases), Germany (138,273 cases), or elsewhere in the United States (671,493 cases). *See COVID-19 Map – Johns Hopkins Coronavirus Resource Center*, Johns Hopkins University & Medicine, https://coronavirus.jhu.edu/map.html (last visited Apr. 17, 2020). This tool also fails to screen for pre-symptomatic spread or whether contractors are practicing social distancing.

[47] Roni Caryn Rabin, *Nearly All Patients Hospitalized With Covid-19 Had Chronic Health Issues, Study Finds*, Nytimes.com (Apr. 23, 2020) ("taking people's temperatures in order to

27

Moreover, there is still inmate, staff, and contractor movement: staff do not live at the prisons; essential contractor services allowed into and out of prisons are "for example, medical services, mental health services, religious services and critical infrastructure repairs"; and "the BOP may need to move inmates to better manage the detention bedspace as well as assure that administrative facilities do not become overcrowded beyond available resources."[48]  As one correctional officer stated about the "enhanced screenings" for staff,

> Originally, they gave us a form, and it asked if you'd been exposed, if you had any symptoms, if you had seasonal allergies, how long you had seasonal allergies. Now all they're doing is checking our temperature. You pull up, they put a little forehead thermometer and check your temperature: "OK, you want a mask and gloves? Go on in." No "How are you feeling? Do you have body aches, are you nauseated? Do you have a cough, a runny nose, any of that?" We're not questioned at all.[49]

Another opined that "they're going to make the excuse of 'We're doing enhanced screening to catch it, come back to work.'  That's their answer. Is it the right answer? Hell, no, it's not the right answer."[50]

The BOP also provides conflicting information about inmate screening.  It claims to require all newly admitted asymptomatic inmates to be quarantined for at least 14 days.[51]  But

---

screen them for the coronavirus — a measure that was used on cruise ships and as a way to detect illness in returning travelers at airports, and that has also been proposed for use in the workplace — is likely to miss many people who are not only asymptomatic but also acutely ill").

[48] BOP, *Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp.

[49] Reitman, *supra*, note 40.

[50] *Id.*

[51] *See* BOP, *COVID-19 Action Plan: Phase 5*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp  (last visited May 3, 2020) (Background on Phases 1-4).

the inmate screening tool does not reflect this process, instead directing staff to conduct "normal intake" so long as an inmate has not traveled to a CDC-determined risk location or had close contact with anyone *diagnosed* with COVID-19 in the last 14 days.[52]  And while Phase 5 of BOP's COVID-19 Action Plan purports to significantly decrease inmate movement by requiring that incarcerated individuals at every institution be "secured in their assigned cells/quarters,"[53] this plan does not appear to correct the defective screenings of staff, contractors or inmates, nor does it change the reality that inmates remain in close quarters—still breathing the same air and sharing living space, bathrooms, and showers.

Cases continue to grow because of the disease's fundamental makeup itself.  Most obviously, the virus is wildly infectious.  It survives "on surfaces for days."[54]  But its real danger is described in a single word: aerosol.  Unlike many diseases, "the virus can remain viable and infectious in aerosols for hours"—just breathing will spread the virus, no cough or sneeze required.[55]  In a soon-to-be-published study in a CDC journal, researchers confirmed what was already suspected: "SARS-CoV-2 aerosol was detected" in air samples taken in hospital ICUs and general wards up to four meters from infected patients.[56]  And that result is echoed by the

---

[52] *See* BOP, *Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool*, https://www.bop.gov/coronavirus/docs/covid19_inmate_screening_tool_20200202.pdf (last visited May 3, 2020).

[53] *See COVID-19 Action Plan: Phase Five*, *supra*.

[54] Mary Van Beusekom, *U.S. studies offer clues to COVID-19 swift spread, severity*, Cntr. for Infectious Disease Research & Policy (Mar. 18, 2020), https://www.cidrap.umn.edu/news-perspective/2020/03/us-studies-offer-clues-covid-19-swift-spread-severity.

[55] *See id.*

[56] Guo Zhen-Dong, et al., *Aerosol and surface distribution of severe acute respiratory syndrome coronavirus 2 in hospital wards, Wuhan, China*, Emerging Infectious Disease (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0885_article (peer-reviewed journal published by the

National Academy of Sciences.  In a letter dated April 1, Dr. Harvey Fineberg, Chair of the

National Academy of Medicine's committee on emerging infectious disease, reported that all

available studies were showing "aerosolization of [the] virus from normal breathing."[57]  He

noted how seemingly slight movements can stir up the virus into the air: simply the "doffing of

PPE [personal protective equipment], the cleaning of floors, or the movement of staff" may be

enough to re-suspend "virus-laden aerosol."[58]  Prison officials are powerless to reduce breathing,

coughing, sneezing, or movement in the cramped, shared spaces of prisons—the prison blocks,

the phone blocks, the showers, the legal libraries.  Just as it spreads easily in the most controlled

environments, hospitals, the virus spreads easily in the least prepared, prisons.  To grant Mr.

Smith's motion would in no way "be detrimental to BOP's organized and comprehensive anti-

COVID-19 regimens."  Gov't Opp'n at 13.

Many judges across the country have highlighted the BOP's COVID-19 crisis in their

decisions to grant compassionate release.  *See United States v. Hammond*, 2020 WL 1891980, at

*9 (D.D.C. Apr. 16, 2020) (responding to the government's argument that "BOP is prepared to

deal with pandemics such as the coronavirus" by noting the hundreds of positive cases and

sixteen inmate deaths that resulted "[d]espite the precautions taken by BOP"); *Scparta*, 2020 WL

1910481, at *1 (noting the "dangerous set of conditions and Kafkaesque [quarantine] approach"

employed at Butner); *United States v. Sanchez*, 2020 WL 1933815, at *2 (D. Conn. Apr. 22,

2020) (emphasizing that "almost 1.5 in 10,000 federal inmates has died due to COVID-19, and

---

CDC).  The study found that even in hospitals, the "virus was widely distributed on floors, computer mice, trash cans, and sickbed handrails."  *Id.*

[57]   Letter from Dr. Harvey Fineberg, Nat'l Acad. of Med., to Kelvin Droegemeier, Ph.D., Office of the President (Apr. 1, 2020), https://www.nap.edu/read/25769/chapter/1.

[58]   *Id.* at 2.

there is a 4.42% mortality rate among individuals who have contracted COVID-19 in custody.

These numbers are sobering and, on a population proportion bases, somewhat higher than those

for the U.S. population.") (internal citations omitted); *United States v. Atkinson*, 2020 WL

1904585, at *3 (D. Nev. Apr. 17, 2020) (noting the "*obvious shortcomings*" in BOP's Action

Plan and expressing dissatisfaction with BOP's response to the defendant's application for

compassionate release) (emphasis added); *United States v. Esparza*, 2020 WL 1696084, at *2 (D.

Idaho Apr. 7, 2020) (denying motion but describing the Action Plan's "obvious shortcomings":

"First, testing inside prisons has been scant except for people who self-report symptoms— which

means that statistics about the number of infections already in BOP facilities are *largely*

*meaningless*.  And second, the plan provides no additional protections for high-risk individuals

like Esparza.") (emphasis added).  Likewise, this Court should not credit the government's

argument that the BOP's failing efforts to combat COVID-19 are sufficient and entitled to

deference.

### C. The BOP's Expanded Home Confinement Program is Ineffectual.

As part of the government's promise that the "BOP has instituted unprecedented safety

regimens to ensure inmate health," it touts the recently expanded home confinement program.

Gov't Opp'n at 11, 13.  However, the program erects a complex set of procedural and logistical

hurdles to home confinement that are largely arbitrary, bear little nexus to the current public

health crisis, and disparately harm persons of color.  It has been a dismal failure, with flip-

flopping criteria and abject cruelty.  The BOP informed a number of inmates and their loved

ones recently that the inmates were to be released, only to inform them, a few days later, that no,

they would remain imprisoned. When one district court questioned why it should not find that

the BOP was acting in bad faith in changing the criteria, the government asked for more time

because of "ongoing uncertainty surrounding the home-confinement eligibility criteria."[59]  This

is hardly the "organized and comprehensive anti-COVID-19 regimen[]" proclaimed by the

government.  Gov't Opp'n at 13.  Instead, two months into the crisis, a month since the first

inmate died of COVID-19, with at least 41 inmates now dead and over 2,000 currently infected,

there is still "uncertainty" about the home confinement program.  And it has led to the release of

a mere 1,805 out of the 142,255 federal inmates in BOP-managed institutions (1.3 percent),

which does not even account for the 17,220 who are in contract facilities or 11,282 in "other

types of facilities."[60]

The government acknowledges that Mr. Smith "does not appear to meet BOP's

requirements for expedited home confinement" due to his "PATTERN risk score" and suggests

that this Court should deny him compassionate release on that basis.  *Id*. at 4-5, 13 n. 9 ("If

defendant cannot obtain home confinement under BOP's priority program, then he is not a

suitable candidate for compassionate release.").  The PATTERN recidivism score was created

pursuant to the First Step Act as a means for the BOP to provide inmates with programming

commensurate with their score, and allow inmates to complete the programming as an incentive

to receive earned time credits towards early release.  DOJ, *Department of Justice Announces

Enhancements to the Risk Assessment System and Updates on First Step Act Implementation*

(Jan. 15, 2020), https://www.justice.gov/opa/pr/department-justice-announces-enhancements-

risk-assessment-system-and-updates-first-step-act.  Now, this tool developed to help inmates

---

[59] Andrew Cohen, *Federal Prisons Told Inmates They Were Coming Home Because of COVID-19. Then They Took It Back*, Slate (Apr. 28, 2020), https://slate.com/news-and-politics/2020/04/federal-prisons-reverse-covid-19-releases-william-barr.html.
[60] BOP, *COVID-19 Home Confinement Information*, https://www.bop.gov/coronavirus/ (accessed 4/30/2020 at 10:33 a.m.); BOP, *Statistics*, https://www.bop.gov/about/statistics/population_statistics.jsp (accessed 4/30/2020 at 10:33 a.m.).

rehabilitate and leave prison early is being deployed to deny early release to home confinement (or compassionate release, according to the government).  But "it is still an incomplete tool [and] it has yet to be independently validated, as required by the First Step Act."  In fact, "many questions remain about PATTERN's validity because of possible racial/ethnic and gender bias and because of the tool's overemphasis on static factors such as criminal history."[61]  Indeed, the only publicly reported data on the demographic impact of PATTERN confirms that its use here will have a racially disparate impact on black males.  DOJ's data shows that black males are far less likely than white males to have a PATTERN score that puts them in the "minimum" category: only 7% of black men score as minimum risk, compared with 30%—almost one third—of white men.[62]

What the recidivism score has to do with the risk to a vulnerable inmate of remaining imprisoned during a pandemic is deeply in doubt.  Moreover, the very congressional leaders behind the First Step Act have told Attorney General Barr that "PATTERN was created for an entirely different purpose than for assessing whether prisoners should be released during a pandemic" and they "urge[d] BOP not to use a prisoner's PATTERN score as a consideration for whether they should be released to home confinement during the COVID-19 pandemic."[63]  Yet counsel across the nation are confronting BOP institutions stating that those inmates with,

---

[61] *See* Press Release, After Rising Numbers of Federal Prisoners Test Positive for COVID-19 & First COVID-19 related Death Reported in Federal Prison, Nadler & Bass Renew Call for DOJ to Take Action (Mar. 30, 2020),
https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2893.

[62] *See* U.S. Dep't of Just., *The First Step Act of 2018: Risk and Needs Assessment System* 62, tbl. 8 (2019) (reporting 29.7% of white males in the developmental sample fall in the minimum risk category while only 7% of black males fall in that same category).

[63] *See supra* note 61.

for instance, a disciplinary issue in the past year or a medium PATTERN risk score are flatly ineligible for consideration.  The expanded home confinement program has not resulted in the promised reductions to the prison population that would minimize risks to inmates, prison staff, and their families.

Granting Mr. Smith compassionate release "would [not] undercut the strict criteria BOP employs to determine individual inmate's [sic] eligibility for compassionate release and home confinement."  Gov't Opp'n. at 13.  Congress intentionally "undercut" the "strict criteria" the BOP uses for compassionate release with the statutory amendment to section 3582 in the First Step Act.  Granting home confinement for the remainder of a defendant's sentence is a province of the BOP; granting compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) is the province of this Court.  The jurisdiction is different; the criteria are different; and the BOP's decision about home confinement does not, and should not, substitute for this Court's reasoned decision about compassionate release.

## III.  MR. SMITH'S PERSONAL HISTORY, CHARACTERISTICS, AND MEDICAL CONDITIONS MAKE HIM PARTICULARLY VULNERABLE TO COVID-19.

Mr. Smith's personal history, characteristics, and medical conditions put him in grave danger should he contract COVID-19 in BOP custody.

The fatality rate of COVID-19 increases with age, is highest in men, and disproportionately affects males and African-Americans.[64]  While Mr. Smith is 37 years old, his

---

[64] *See* Chris Mooney et al., *All across the United States, the coronavirus is killing more men than women, data show,* WashingtonPost.com (Apr. 4, 2020); Reis Thebault et al., *The coronavirus is infecting and killing black Americans at an alarmingly high rate*, WashingtonPost.com (Apr. 8, 2020); Eleanor Cummings, *What We Know About Whom COVID Kills*, Slate (May 1, 2020), https://slate.com/technology/2020/05/covid-deaths-demographics-age-race-gender.html; Akilah Johnson & Talia Buford, *Early Data Shows African Americans Have Contracted and Died of Coronavirus at an Alarming Rate*, ProPublica (Apr. 3, 2020),

physiological age is likely akin to 47 to 52 years.  *See The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Office of Inspector General, U.S. Dep't of Just. at 1-2 (May 2015) (revised Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf ("an inmate's physiological age averages 10–15 years older than his or her chronological age due to the combination of stresses associated with incarceration and the conditions that he or she may have been exposed to prior to incarceration").  The hospitalization and death rate for COVID-19 increases "starting [] from around 40 years [old]."[65]  And the CDC's most recent accounting of fatality rates indicates that 577 deaths out of 24,637 male deaths in the United States were men aged 35 to 44 years old,[66] which is a mortality rate of approximately 2.3%.  In contrast, "[t]he seasonal flu that we deal with every year has a mortality of 0.1%."[67]  Although the CDC has not been tracking fatalities by sex, "the majority of victims are men," which may have "deep biological roots" centered on how women's bodies are better at fighting off infection.[68]  In fact, "[t]he risk of men dying of COVID-19 is double that of women."[69]

---

https://www.propublica.org/article/early-data-shows-african-americans-have-contracted-and-died-of-coronavirus-at-an-alarming-rate.

[65] World Health Organization (WHO), *Coronavirus disease 2019 (COVID-19) Situation Report – 51* at 2, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_8.

[66] *See Provisional Death Counts*, https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.

[67] Claire Gillepsie, *This Is How Many People Die From the Flu Each Year, According to the CDC*, Health (Mar. 26, 2020), https://www.health.com/condition/cold-flu-sinus/how-many-people-die-of-the-flu-every-year.

[68] Mooney, *supra*, note 64.

[69] *See* Kashmira Gander, *Men Twice As Likely to Die Frim COVID-19 Than Women, Study of Chinese Coronavirus Patients Suggests*, Newsweek (Apr. 29, 2020) https://www.newsweek.com/men-more-likely-die-coronavirus-1500823.

In addition, emerging "data and census demographics shows that counties that are majority-black have three times the rate of infections and almost six times the rate of deaths as counties where white residents are in the majority. Unlike several states and counties, the CDC was not tracking COVID-19 by race until recently, but now that it is, the CDC's own statistics support what states and counties have found: that COVID-19 is "infecting and killing black Americans at a disproportionately high rate," so much so that this "emerging stark racial disparity led the surgeon general [] to acknowledge in personal terms the increased risk for African Americans[.]" Although more limited than the states, the CDC's own limited reporting shows that "even though African Americans accounted for 18 percent of the population, they made up 33 percent of people hospitalized." This likely "represent[s] [the] legacy of growing up poor and black in America," with the unequal access to healthcare and nutrition that disproportionally burden African-Americans' health and wellbeing.[70]

Mr. Smith also has a heart condition, a history of smoking, and neurological issues as a result of gunshot wounds. A 2014 D.C. Department of Corrections ("DOC") comprehensive medical intake evaluation documents his "abnormal" heartbeat. *See* Ex. E (DOC Medical Records, filed under seal), Comprehensive Intake (09/20/2014) ("grade2 /6 DM loudest at apex"). The same evaluation notes a history of smoking cigarettes. Similarly, a 2011 comprehensive intake encounter notes a history of heart disease ("Type: murmur") and "Heart: abnormal." *Id*., Comprehensive Intake (05/21/2011) ("Details: grade /6 SEM loudest LLSB."). It also notes a diagnosis of "NICOTINE ADDICTION" and "ADVISED TO QUIT SMOKING." *Id*. A 2009 evaluation documents the same conditions. *Id*., Comprehensive Intake (01/24/2009). In 2002, records reflect a "HEART MURMUR –RADIATING" and "CARDIOLOGY

---

[70] Thebault et al., *supra*, note 64.

REFERRAL." *Id.*, Intake Processing (10/16/2002).  In addition to his heart condition and history of smoking, DOC records from 2014 reflect radiographic report findings of "effusion" and mild degenerative joint disease ("Mild DJD") in Mr. Smith's right knee; and records from 2005 reflect abnormal neurological functioning in Mr. Smith's right leg as a result of a gunshot wound and indicate a diagnosis of "HYPESTHESIA, DISTAL MEDICAL R. THIGH (s/p gsw injury)."  *Id.*, Office Visit (02/09/2005), Chronic Care (04/21/2014), Radiology Routine (04/03/2014).  Mr. Smith has periodic pain in his right leg still today, and reports that it becomes "numb" when he sits for too long at a time.

The CDC reports that COVID-19 is especially harmful to those with serious heart conditions.[71]  Experts are only starting to understand why COVID-19 is so deadly in those with heart conditions.  Since the pandemic began, it has been widely known that COVID-19 damages the lungs by "inflaming and clogging the tiny air sacs in the lungs, choking off the body's oxygen supply until it shuts down the organs essential for life."  But now clinicians are recognizing that "the virus also may be causing heart inflammation, acute kidney disease, neurological malfunction, blood clots, intestinal damage and liver problems."  "Clinicians in China and New York have reported myocarditis, an inflammation of the heart muscle, and, more dangerous, irregular heart rhythms that can lead to cardiac arrest in covid-19 patients."[72]  Mr. Smith already has exactly that—an irregular heart rhythm.  In addition, the CDC states that "[n]eurological and neurologic" conditions "may increase the risk of serious COVID-19 for

---

[71] *See* CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[72] Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere,* WashingtonPost.com (Apr. 15, 2020).

individuals of any age."[73]  In light of his prior gunshot wounds and the chronic pain and numbness in his leg, Mr. Smith may have an undiagnosed and untreated neurological condition putting him at even greater risk.

Mr. Smith's history of smoking also puts him at greater risk.  Smokers may have higher risk of catching COVID-19 and are "prone to severe CVOID-19 infections."[74]

Should Mr. Smith contract COVID-19, the results may be devastating.  "The time course of the disease can be very rapid.  Individuals can show the first symptoms of infection in as little as two days after exposure and their condition can seriously deteriorate in as little as five days (perhaps sooner) after that."  *See* Ex. F, Decl. of Mark Stern, Correctional Health Expert (Mar. 15, 2020), at ¶ 4.  "Vulnerable people who are infected by the COVID-19 virus can experience severe respiratory illness, as well as damage to other major organs.  Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration and intensive care support."  *Id.* at ¶ 6.  "For high risk patients who do not die from COVID-19, a prolonged recovery is expected to be required, including the need for extensive rehabilitation for profound deconditioning, loss of digits, neurologic damage, and loss of respiratory capacity[.]"  Ex. G, Decl. of Jonathan Louis Golob, Asst. Professor, Univ. of Mich.

---

[73] CDC, Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission (Mar. 13, 2020), at Appendix A, https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[74] Nicoletta Lanese, *Why COVID-19 hits smokers harder*, Live Science (Apr. 10, 2020), https://www.livescience.com/coronavirus-covid-19-risk-and-smoking.html; Tiffany Kary, *FDA Says Smokers May Have Higher Risk of Catching Covid-19*, Bloomberg (Apr. 21, 2020), https://www.bloomberg.com/news/articles/2020-04-21/fda-now-says-smokers-may-have-higher-risk-of-catching-covid-19; *Q&A on smoking and COVID-19*, World Health Organization (Mar. 24, 2020), https://www.who.int/news-room/q-a-detail/q-a-on-smoking-and-covid-19.

School of Medicine (Mar. 13, 2020), at ¶ 4.[75]  Ventilators are currently in short supply in the

United States; if Mr. Smith falls ill, there is no guarantee that he will have access to one.[76]

There is currently no vaccine to prevent COVID-19 and no known cure or antiviral

treatment for COVID-19.  As the CDC explains, the risk of exposure to COVID-19 increases in

"crowded, closed-in settings with little air circulation if there are people in the crowd who are

sick," and people who are at high risk for severe illness should "avoid crowds," "stay home as

much as possible to further reduce your risk of being exposed," and "avoid touching high-touch

surfaces."[77]  "Confined to a small cell where social distancing is impossible, [Mr. Smith] cannot

provide self-care because he cannot protect himself from the spread of a dangerous and highly

contagious virus."  *Perez*, 2020 WL 1546422, at *4.

Correctional and medical experts would generally agree that releasing inmates is the most

meaningful, effective way to mitigate his high risk of serious illness or death during the current

unprecedented pandemic.  The emerging consensus among public health experts is that it is

absolutely critical to reduce incarceration in order to contain the spread of this virus.  *See, e.g.,*

Stern Decl. ¶ 11 ("As a correctional public health expert, I recommend the release of eligible

individuals from detention, with priority given to the elderly and those with underlying medical

conditions most vulnerable to serious illness or death if infected with COVID-19.").  Shrinking

the inmate population "allows for greater social distancing, which reduces the chance of spread if

---

[75] These declarations were prepared in other cases, but their facts and recommendations apply to all high-risk individuals in detention facilities.

[76] *See* Sarah Kliff, et al., *There Aren't Enough Ventilators to Cope With the Coronavirus*, NYTimes.com (Mar. 26, 2020).

[77] *See* CDC, *Get Ready for COVID-19* (Mar. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html & CDC, *Steps to Prevent Getting Sick* (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html.

virus is introduced; it allows easier provision of preventive measures such as soap for

handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps

prevent overloading the work of detention staff such that they can continue to ensure the safety

of detainees." *Id.* ¶ 9. Mr. Smith's release from imprisonment would help protect both him and

the community from the dangers posed by concentrated populations and community spread.

Indeed, realizing the danger of COVID-19 in detention facilities, courts all over the

country, in various procedural postures, are acknowledging the uncontroverted evidence that it is

safer for the entire community if inmates, like Mr. Smith, who are at high-risk of death or injury

from the virus, and who do not pose any immediate danger to others, are released. *See, e.g.,*

*Karr v. Alaska*, 2020 WL 1456469, at *2 (Ct. of App. Alaska Mar. 24, 2020) (citations omitted)

("Incarcerating a defendant under conditions that do not permit compliance with widespread

health directives designed to halt the spread of the virus poses significant health risks not only to

other inmates and to correctional facility staff, but also to the rest of the public.").[78]

When this Court sentenced Mr. Smith, it did not "intend for that sentence to 'include a

great and unforeseen risk of severe illness or death' brought on by a global pandemic." *United*

*States v. Zukerman*, No. 1:16-cr-194-AT, Dkt. No. 116 (Apr. 3, 2020) ("The severity of

Zukerman's conduct remains unchanged. What has changed, however, is the environment where

---

[78] *See also United States v. Underwood*, Case No. 8:18-cr-201-TDC, ECF No. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future"); *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v Garlock*, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in *sua sponte* extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19").

Zukerman is serving his sentence."). "These are not normal times[.]"  *United States v. Gonzales*, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (granting compassionate release to 60-year old defendant with underlying health condition).  The exponential infection rate of COVID-19 and high mortality rate for those of Mr. Smith's gender and race, and with his conditions, coupled with BOP conditions, make clear that these are just the kind of extraordinary and compelling circumstances that warrant a sentence reduction in this case.

The extraordinary and compelling circumstances of COVID-19, coupled with Mr. Smith's personal history, characteristics, and medical conditions, and the conditions at in prison, warrant compassionate release.  Accordingly, the Court should exercise its discretion to order Mr. Smith's immediate release from prison.

### III.   MR. SMITH IS NOT A DANGER TO THE COMMUNITY AND HIS CONTINUED INCARCERATION IS GREATER THAN NECESSARY TO ACCOMPLISH THE GOALS OF SENTENCING.

The § 3553(a) factors also support compassionate release.  This is a non-violent drug offense.  Mr. Smith entered a binding plea agreement to a sentence within the range of 100 to 120 months, and the Court sentenced Mr. Smith based on a career offender designation which *then* subjected Mr. Smith to a Guidelines range of 188 to 235 months.  *See* Statement of Reasons, ECF No. 57.  But, under the correct interpretation of the law today, Mr. Smith was not a career offender because he has only one prior qualifying offense.  Thus, if sentenced today for the same crime, he would have received a lower sentence.

At the time of sentencing, the parties and the Court considered his prior 2011 attempted distribution of a controlled substance conviction to be one of the two qualifying offenses for the career offender designation.  *See* Presentence Investigation Report ("PSR") ¶ 39.  However, in *United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018), the D.C. Circuit held that the

41

applicable provision of the career offender guideline "clearly excludes inchoate offenses."  With

the correct guidelines calculation, Mr. Smith's total offense level would have been 23, instead of

31; and the applicable Guidelines range (with his criminal history category of VI) was 92 to 115.

"[T]he fact that [Mr. Smith] would not receive the same sentence if the crime occurred today" is

part of the combination of factors that "all represent extraordinary and compelling grounds to

reduce his sentence."  *United States v. Maumau*, 2020 WL 806121, at *5 (D. Utah Feb. 18,

2020).

 This Court sentenced Mr. Smith to 100 months, the lowest end of Guidelines range

agreed upon by the parties.  This sentence was 88 months lower than the lowest end of the

Guidelines range that was calculated to apply (188 months).  A proportional downward variance

from the lowest end of the correct Guidelines range (92 months) would be a sentence of

approximately 49 months.  Mr. Smith has been incarcerated since September 23, 2014, for over

67 months.  He has served over the 5-year mandatory statutory minimum for his non-violent

crack offense.  By counsel's calculations, factoring in all good time credit it would be possible

for Mr. Smith to earn, he has served the equivalent of approximately a 79-month sentence.  In

other words, had Mr. Smith been sentenced to serve 79 months and earned all good time credit

possible, he would have been released from custody on or around May 2, 2020.

 Thus, Mr. Smith has served a significant and sufficiently harsh sentence.  Reducing his

sentence would not, as the government claims, "undercut the seriousness of his crime."  Gov't

Opp'n at 16.  Rather, it would reflect an appropriate consideration of the sentencing factors

today, in light of the current pandemic.

 Mr. Smith's conduct in prison has been excellent.  It does not appear that he has lost any

good time credit.  He has incurred only two minor disciplinary infractions, one for refusing to

obey an order and one for "trying to shop commissary during a diff[erent] unit time." And, as Mr. Smith states in his *pro se* motion, he "did not sit idle" in prison. Instead, he "utilized his time to further educate himself" and participated in numerous educational and vocational programs. *See* ECF No. 69 at 3. He also works as a head orderly, supervising several other inmates and helping to maintain cleanliness at the facility. *Id*. Although rehabilitation, by itself, is not grounds for a sentence reduction, U.S.S.G. § 1B1.13 appl. n. 3 (citing 28 U.S.C. § 994(t)), the Court should consider Mr. Smith's post-offense developments under § 3553(a), *Pepper v. United States*, 562 U.S. 476, 492 (2011).

Mr. Smith is not a danger to the community and any risk he poses can be mitigated by supervision, including home confinement. The Court could impose home confinement as an additional condition of supervised release for up to the remainder of Mr. Smith's original term of imprisonment (until approximately November 7, 2021, his current projected release date). *See* 18 U.S.C. § 3583(e)(4) (providing that home confinement may be imposed as an alternative to incarceration); *United States v. Zuckerman*, 1:16-cr-194, dkt #119 (S.D.N.Y. Apr. 3, 2020) (sentence of imprisonment modified to time served with remaining portion of original term to be served as supervised release with condition that defendant be subject to home incarceration without electronic monitoring); *United States v. Atwi*, No. 4:18-cr-20607, dkt #38 (E.D. Mich. Apr. 20, 2020) (sentence reduced to time served and period of supervised release extended by amount of time remaining on custodial sentence, three months, with those months to be served in home confinement without electronic monitoring); *United States v. Sanchez,* No. 3:18-cr-140, 2020 WL 1933815 (D. Conn. Apr. 22, 2020) (granting motion for compassionate release, modifying term of incarceration to time served, increasing period of supervised release, and requiring home detention for first year of that release); *United States v. Williams*, No. 3:04-cr-95,

2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) (reducing sentence to time served and adding as a condition of supervised release that the defendant be subject to one year on home confinement); *United States v. Burrill*, No. 17-cr-491, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020) (ordering the remaining portion of defendant's original term of imprisonment to be "served as supervised release with the special condition that Burrill shall be subject to home confinement"); *United States v. Early*, No. 1:09-cr-282, dkt #132 (Minute Entry May 5, 2020) (amending conditions of supervised release as part of compassionate release grant to require first six months be on home detention with location monitoring).

Undersigned counsel spoke with Mr. Smith's mother, who indicated that he may reside with her or with his grandmother at the address verified by the Probation Office in the PSR. Accordingly, the Court should conclude that the time Mr. Smith has served is sufficient to meet the purposes of sentencing, particularly in light of the extraordinary and compelling circumstances in this case.

The government's request for a "14-day period and medical clearance prior to the defendant's release," Gov't Opp'n at 17 n. 17, is, as other courts have explained, "dangerous," "Kafkaesque" and "plain absurdity." *United States v. Scarpta*, 2020 WL 1910481, at *1, *3 (S.D.N.Y. Apr. 20, 2020). It would be one thing if the BOP would test Mr. Smith before releasing him to ensure he does not test positive. However, the BOP will not; and the government does not make that request. Instead, the government asks that Mr. Smith remain in a contaminated environment for at least two additional weeks for no reason. Such a request is "not mandated by any statute, regulation, or informal guidance issued by the Attorney General," but rather "an illogical and self-defeating policy that appears to be . . . ungrounded in science, and a danger to both Mr. [Smith] and the public health of the community." *Id*. at *3. This Court

should therefore order Mr. Smith's immediate release and permit him to self-quarantine at home upon his release.

## CONCLUSION

For the foregoing reasons, Mr. Smith respectfully requests that the Court grant his motion and reduce his sentence to time-served.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

CELIA GOETZL
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500